# EXHIBIT B



**COUNTY OF ROCKLAND**
**DEPARTMENT OF PROBATION**
Allison-Parris County Office Building
11 New Hempstead Road
New City, New York 10956
(845) 638-5544
FAX (845) 638-5648

C. SCOTT VANDERHOEF
County Executive

JACQUELINE STORMES
Director of Probation III
KATHLEEN TOWER-BERNSTEIN
Deputy Director of Probation III

July 11, 2006

Mr. James Gould
P.O. Box 157
Slate Hill, New York 10973-0157

Re:   NOTICE OF DETERMINATION
      CIVIL SERVICE LAW SECTION 75 DISCIPLINARY PROCEEDING

Dear Mr. Gould:

After careful review of the report and recommendations of Hearing Officer Bonnie Siber Weinstock dated June 30, 2006, and the record of disciplinary proceeding against you on the Amended and Supplemental Charges and Specifications contained in my letter dated January 11, 2006, addressed to you, I adopt all of the Findings of Fact and Conclusions of Law made by the Hearing Officer.

I, therefore, find you guilty of the following charges and specifications as set forth in said letter:

CHARGE I:   GROSS MISCONDUCT – SEXUAL ABUSE OF A PATIENT
            Specification

CHARGE II:  GROSS MISCONDUCT:  RECKLESSLY ENDANGERING THE
            WELFARE OF A CHILD
            Specification

CHARGE III: GROSS MISCONDUCT;  SECOND DEGREE HARASSMENT OF
            A 14-YEAR OLD BOY IN VIOLATION OF SECTION 240.26(3) OF
            THE NEW YORK STATE PENAL LAW
            Specification

CHARGE IV: GROSS MISCONDUCT: INJURY TO THE REPUTATION OF
THE DEPARTMENT
Specification

I adopt the recommendation of the Hearing Officer as to the penalty to be imposed in this case. Accordingly, you are hereby dismissed from County employment as of November 19, 2004, the effective date of your disciplinary suspension without pay. As the result of adopting said recommendation to discharge you effective November 19, 2004, you are indebted to the County of Rockland in the total amount of NINETY-SIX THOUSAND THREE HUNDRED TWO AND 92/100 ($96,302.92) DOLLARS[1].

Please contact the Commissioner of Finance at your earliest convenience to arrange for the repayment of said $96,302.92 sum.

Under the provisions of Section 76 of the Civil Service Law you are entitled to appeal from this dismissal either to the Civil Service Commission or to the Courts. If you elect to appeal to the Commission such appeal must be made in writing within 20 days after receipt of this Notice of Determination. A copy of Section 76 is attached hereto for your reference.

A copy of the Report and Recommendations of the Hearing Officer is attached for your reference.

Very truly yours,

Jacqueline Stormes
Director of Probation

cc:     Susan Sherwood – Deputy County Executive
Kathleen Tower-Bernstein – Assistant to the Director Probation Dept.
✓ Jeffrey J. Fortunato – Deputy County Attorney
Patricia Prendergast – Commissioner of Personnel
Karen Cassa – Insurance Coordinator
Michael Sussman, Esq.
Steve Chanowsky - CSEA Labor Relations Specialist
William Riccaldo – Local President CSEA
P.T. Thomas – Unit President CSEA

---

[1] Amount salary plus amount benefits ($80,082.92--salary) ($16,220.00--benefits) paid to you beyond your effective date of termination.



McKinney's Civil Service Law § 76

▶

**Effective: [See Text Amendments]**

McKinney's Consolidated Laws of New York Annotated Currentness
  Civil Service Law (Refs & Annos)
    Chapter 7. Of the Consolidated Laws (Refs & Annos)
      ◥ Article V. Personnel Changes
        ◥ Title B. Removal and Other Disciplinary Proceedings

  →§ 76. Appeals from determinations in disciplinary proceedings

1. Appeals. Any officer or employee believing himself aggrieved by a penalty or punishment of demotion in or dismissal from the service, or suspension without pay, or a fine, or an official reprimand, unaccompanied by a remittance of said officer or employee's prehearing suspension without pay, imposed pursuant to the provisions of section seventy-five of this chapter, may appeal from such determination either by an application to the state or municipal commission having jurisdiction, or by an application to the court in accordance with the provisions of article seventy-eight of the civil practice law and rules. If such person elects to appeal to such civil service commission, he shall file such appeal in writing within twenty days after service of written notice of the determination to be reviewed, such written notice to be delivered personally or by registered mail to the last known address of such person and when notice is given by registered mail, such person shall be allowed an additional three days in which to file such appeal.

2. Procedure on appeal. Where appeal is taken to the state or municipal commission having jurisdiction, such commission shall review the record of the disciplinary proceeding and the transcript of the hearing, and shall determine such appeal on the basis of such record and transcript and such oral or written argument as the commission may determine. The commission may direct that such appeal shall be heard by one or more members of the commission or by a person or persons designated by the commission to hear such appeal on its behalf, who shall report thereon with recommendations to the commission. Upon such appeal the commission shall permit the employee to be represented by counsel.

3. Determination on appeal. The determination appealed from may be affirmed, reversed, or modified, and the state or municipal commission having jurisdiction may, in its discretion, direct the reinstatement of the appellant or permit the transfer of such appellant to a vacancy in a similar position in another division or department, or direct that his name be placed upon a preferred list pursuant to section eighty-one of this chapter. In the event that a transfer is not effected, the commission is empowered to direct the reinstatement of such officer or employee. An employee reinstated pursuant to this subdivision shall receive the salary or compensation he would have been entitled by law to have received in his position for the period of removal including any prior period of suspension without pay, less the amount of any unemployment insurance benefits he may have received during such period. The decision of such civil service commission shall be final and conclusive, and not subject to further review in any court.

4. Nothing contained in section seventy-five or seventy-six of this chapter shall be construed to repeal or modify any general, special or local law or charter provision relating to the removal or suspension of officers or employees in the competitive class of the civil service of the state or any civil division. Such sections may be supplemented, modified or replaced by agreements negotiated between the state and an employee organization pursuant to article fourteen of this chapter. Where such sections are so supplemented, modified or replaced, any employee against

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

McKinney's Civil Service Law § 76

whom charges have been preferred prior to the effective date of such supplementation, modification or replacement shall continue to be subject to the provisions of such sections as in effect on the date such charges were preferred.

CREDIT(S)

(L.1958, c. 790, § 1; amended L.1962, c. 310, § 68; L.1964, c. 626, § 1; L.1969, c. 721, § 1; L.1970, c. 458, § 1; L.1972, c. 283, § 1; L.1985, c. 851, § 1; L.1985, c. 852, § 1.)

HISTORICAL AND STATUTORY NOTES

1999 Main Volume

**L.1970, c. 458 legislation**

L.1970, c. 458, § 2, eff. May 5, 1970, provides:

"The supplementary or modified provisions of sections seventy-five and seventy-six of the civil service law contained in any agreement negotiated between the state and an employee organization pursuant to article fourteen of this chapter shall apply only to those disciplinary actions commenced subsequent to the effective date of any such negotiated agreement."

**Memorandum of State Civil Service Department on 1958 Revision**

"Under the present law the right to appeal to the civil service commission having jurisdiction from a determination in a disciplinary proceeding is granted only to State employees, city employees, and employees in the county offices within the City of New York. An employee of a county or other civil division in such county may appeal to the county civil service commission only if the board of supervisors has elected to permit such appeals. School district employees have no right to appeal, except to the courts.

"The new law [subd. 1 of this section] would give all employees the right of appeal to the civil service commission having jurisdiction from a determination in a disciplinary proceeding."

**Derivation**

Civil Service Law of 1909, c. 15, § 22, subd. 3, added by L.1941, c. 853, and amended by L.1942, c. 216, § 2; L.1945, c. 607; L.1947, c. 125; L.1952, c. 398; L.1955, c. 596, § 2; L.1957, c. 350, § 2, and repealed by L.1958, c. 790, § 1. Said § 22 derived from Civil Service Law of 1899, c. 370, § 21, as amended by L.1902, c. 270; L.1904, c. 697; originally revised from L.1888, c. 119, § 1, as amended by L.1890, c. 67; L.1892, c. 577; L.1898, c. 184; L.1884, c. 312, § 1, as amended by L.1887, c. 464; L.1894, c. 716; L.1896, c. 821.

CROSS REFERENCES

Proceedings against body or officer, generally, see CPLR 7801 et seq.

Right of appeal for redress of grievances on account of employment in civil service not to be denied, see Civil Rights Law § 15.

LIBRARY REFERENCES

1999 Main Volume

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
In the Matter of the Proceeding
  Pursuant to Section 75 of the
  Civil Service Law

    between                              REPORT and
                                         RECOMMENDATIONS
COUNTY OF ROCKLAND - DEPARTMENT OF
  PROBATION

    and

JAMES GOULD
```

BEFORE: Bonnie Siber Weinstock, Hearing Officer

APPEARANCES:

For the County:     Jeffrey J. Fortunato, Esq. - Deputy
County Attorney
Kathleen Tower-Bernstein - Deputy
Director, Department of Probation
DL - Witness (by subpoena)
Det. Sgt. Patrick Cooney - Rockland Co.
Sheriff's Department
Det. Shari Moody-Dennison - Rockland Co.
Sheriff's Department
Jill Lagnado - Supervising Probation
Officer
P.O. Jesse Scott Abbott - Cortland
Police Department
Sgt. William Carpenter - Cortland Police
Department
Lt. Jonathan Gesin - Cortland Police
Department
Cathrine L. - DL's mother
Mark L. - DL's father

For the Respondent:   Michael H. Sussman, Esq. - Counsel
James H. Gould - Respondent
Diane S. Gould - Spouse

The County of Rockland ("County" or "Employer")
preferred Charges, dated November 19, 2004 (E-4)[1], against James
Gould ("Respondent") under Section 75 of the Civil Service Law.

---

[1] Joint exhibits from the record are cited herein as "J--";
Employer exhibits are "E--" and Respondent exhibits are cited as
"R--."

The Charges were amended and supplemented, dated January 11, 2006 (E-5). The Amended Charges sought the Respondent's dismissal from service. Hearings were held on these Charges on February 20, 21 and 22, 2006 in Cortland, New York before the undersigned Hearing Officer. The hearings were transcribed.[2] The parties had full and fair opportunity to present evidence and argument, to engage in the examination and cross-examination of sworn (or affirmed) witnesses, and otherwise to support their respective positions. The record was declared closed upon the Hearing Officer's receipt of the parties' Briefs and Reply Briefs.

ISSUES

At the hearing on February 20, 2006, the parties agreed to submit the following issues for arbitration (TR at 27-28):

(1)  Is the Respondent guilty of the Charges contained in the Notice of Charges? If so, what is the appropriate penalty?

(2)  Was there just cause to suspend the Respondent for thirty days? If not, what shall be the remedy?

The parties also acknowledged that the Hearing Officer would frame an issue which included the allegation of retaliation if

---

[2]  References to the transcribed record of hearing appear herein as "TR at --" for the February 20th hearing, "2TR at --" for the February 21st hearing, and "3TR at --" for the February 22nd hearing.

3

the Respondent chose to raise that issue during the course of the Section 75 hearing.[3] (TR at 21-22, 24-25, 27).

### BACKGROUND

James Gould, the Respondent, has been employed by the County since 1977. He commenced work with the Department of Probation in 1984, and since April 2003, he has been a Senior Probation Officer. (TR at 31). An incident allegedly occurred in Cortland, New York on April 24, 2004 while the Respondent was off-duty. As a result of that alleged incident, the County preferred Charges against the Respondent. The Respondent first elected to pursue arbitration (R-2) and the undersigned was appointed Arbitrator (J-1). At that time, the Respondent was represented by other Counsel. The undersigned issued a ruling dated January 1, 2006 granting the Respondent's Counsel some requested accommodations in the scheduling of the hearings, and granting the County's request that the hearings initially be conducted in Cortland where numerous witnesses resided or worked. (E-15; TR at 15-16).

Thereafter, Michael Sussman, Esq., was substituted as the Respondent's Counsel and the Respondent sought to change his election of arbitration and instead to pursue his defense against the Charges in the forum of a Section 75 proceeding. (R-5). The County did not object to the Respondent's request provided he

---

[3]  The Respondent did not raise the question of alleged retaliation for filing a complaint with the New York State Division of Human Rights.

4

waived any jurisdictional objections to the venue of the hearing.
Accordingly, the undersigned has presided over this Section 75
proceeding as Hearing Officer and renders this Report and
Recommendations.

The Charges against the Respondent, which are discussed
in detail below, allege that the Respondent endangered the
welfare of a child (referred to herein as "DL") and brought
injury to the reputation of the Department of Probation by virtue
of his actions on April 24, 2004, and by his plea to the
violation of Harassment in the Second Degree. The County
contends that the charged conduct constitutes gross misconduct.
The County argues that the Respondent's misconduct goes to the
heart of the duties of his job, i.e., protecting minors and
modelling moral and non-criminal behavior. The County urges that
discharge from service is the appropriate penalty for the
misconduct proven. The County asks the Hearing Officer to uphold
the Charges and to direct the Respondent's termination from
employment.

The Respondent, on the other hand, urges that he
engaged in no wrongdoing whatsoever. The Respondent contends
that he never endangered the welfare of a child. He asserts that
he did have a conversation with someone he thought was a college
age student, and that student prolonged the conversation with Mr.
Gould. He insists that the allegations against him are the
product of the mind of a gay youth who "fantasized about his
contact with Gould and on that basis made this encounter

5

something it never was." (Brief at p. 1). The Respondent urges
that DL offered various versions of his story at different times
which render DL incredible. The Respondent asks that he be
reinstated to his position and made whole for lost wages,
benefits and seniority.

### DISCUSSION

As a threshold matter, the County contends that the
Charges were timely filed as they were preferred within 18 months
after the misconduct allegedly occurred. Civil Service Law
Section 75(4) states:

> Notwithstanding any other provision of law, no removal
> or disciplinary proceeding shall be commenced more than
> eighteen months after the occurrence of the alleged
> incompetency or misconduct complained of and described
> in the charges...provided, however, that such
> limitations shall not apply where the incompetency or
> misconduct complained of and described in the charges
> would, if proved in a court of appropriate
> jurisdiction, constitute a crime.[4]

A disciplinary proceeding is "commenced" under Civil Service Law
§75 with the filing of the Charges. Mikoleski v. Bratton, 249 AD
2d 83, 671 NYS 2d 75 (1st Dept. 1998). Since the events in issue
occurred on April 24, 2004, the Charges would be timely if filed
by October 24, 2005, i.e., within 18 months. The Hearing Officer
finds that on November 19, 2004, well within the 18 month statute

---

[4] This language, with a slight grammatical change and without
the phrase "notwithstanding any other provision of law" appears in
Article V(2)(g) of the collective bargaining agreement between the
County and the Civil Service Employees Association, dated January
1, 2002, under which the Respondent is covered.

6

of limitations, the County preferred three Charges against the Respondent. (E-4). All are timely filed. Civil Service Law §75(4) also excludes from the 18 month statute of limitations charges of misconduct or incompetency which "if proven in a court of appropriate jurisdiction [would] constitute a crime."[5]

On January 11, 2006, the County amended and supplemented the November 19, 2004 Charges and Specifications (E-5). According to the County's letter dated January 11, 2006, "Charge I has been amended to add the Grievant's May 6, 2004, written admission that grievant asked the child where a gay bar was." The Hearing Officer finds that the "admission" referred to in the proposed amendment was known to the County on May 6, 2004 or shortly thereafter. Therefore, the County had 18 months from May 6, 2004, or until November 6, 2005, to amend the Charges. The County did not do so. Therefore, the Hearing Officer finds that the Amendment to Charge I is not timely. The Hearing Officer further finds that the Section 75(4) exclusion from the 18 month statute of limitations for matters that might constitute a crime does not apply to this Amendment, because at the time the Amendment to the Charges was sought (i.e., January 11, 2006), the criminal matter had been disposed of on June 28, 2005 (E-19) with a plea to a <u>violation</u>. The Hearing Officer finds, however, that even though the amendment to Charge I is rejected, the contents

---

[5]  At the time the Charges were filed on November 19, 2004, the Charges, if proven, would have constituted the crime of endangering the welfare of a child. Accordingly, the Charges were timely filed under either theory (i.e., the 18 month statute of limitations, or the criminal act exception).

7

of the Respondent's written admission on May 6, 2004 are <u>facts</u> in the record, and the Charges as originally drafted did make reference to "gay bars." The Amendment rejected deals with reference to the Respondent's written admission on May 6, 2004.

The County next sought to add a new Charge III to reflect that on June 28, 2005 the Respondent pled guilty to one count of Second Degree Harassment in violation of Penal Law §240.26(3). Since this plea occurred on June 28, 2005, the County had 18 months from that date within which to amend the Charges. Since the Amendment occurred on January 10, 2006, it was well within the permissible statutory time. Therefore, that Amendment is accepted.

The Hearing Officer also accepts the Amendment to the old Charge III which became Charge IV, and finds no substantive change in the Charge.

Clearly, the Charges are predicated upon an alleged incident in Cortland on April 24, 2004. A full discussion of that incident follows. The Charges allege that the Respondent made inappropriate remarks to and propositioned a 14 year old male referred to herein as "DL." (TR at 70). DL testified in this proceeding, as did other witnesses called in the County's case. The Respondent did not testify, as is his right, and the Hearing Officer draws no inference whatsoever from his decision not to testify.[6] The facts as found in this Report and

---

[6] In its Brief, the County asks the Hearing Officer to draw a negative inference from the Respondent's failure to testify. (Brief at p. 5). The Hearing Officer does not draw a negative

8

Recommendations are based on the testimony credited from the witnesses who did testify.

DL testified that he was walking home from a play rehearsal at approximately 5:30 PM. (The date of Saturday, April 24, 2004 is not contested. [TR at 104-05].) As he neared the intersection of Port Watson and Hyatt Streets, a man driving a white car approached him and rolled down the passenger side window. (TR at 73, 75, 117). DL testified that the driver, now identified as James Gould, asked him if he knew where any gay bars were in town. (TR at 73).[7] DL testified, "I then told him that I didn't know of any and there might be one in Ithaca or the surrounding city." (TR at 73).

According to DL, the Respondent asked him if he was a freshman in college, and DL told Mr. Gould that he was not; he was in 8th grade and was 14 years old. (TR at 74). DL testified on direct examination that he learned the Respondent was from out of town and they began talking about New York City. DL continued:

_____

inference in this case. As indicated herein, there is more than ample evidence in the record even without a negative inference to support the Charges and Specifications. The failure of the Respondent to testify means that the testimony of the other witnesses is not weighed against his version of the facts. In some cases, that left the testimony of other witnesses uncontroverted.

[7] DL testified after being shown the written statement he gave to Sgt. Carpenter (E-17), that at the time of the written statement he recalled details that he did not recall almost two years later when he was testifying. For example, he did not recall that the Respondent had first asked "where the joints" were, before asking where the gay bars were. (TR at 101-06).

9

He stated that he was staying at the Holiday Inn.[8]
And I believe at that time he had asked if I wanted to
come back to his hotel room with him.  I was sort of a
little shocked.  I wasn't exactly expecting that in the
conversation.  So I didn't want to be rude, so I tried
to change the subject.  I believe I mentioned something
about the fact that my father used to work in The City.
And around that time, he started to touch himself in
the ---

Q[County Counsel]:  Can you be very specific about
that?

A.[DL]:  Started to touch his penis.  I was trying to
end the conversation and I remember that he -- with his
left hand, he was playing with himself and --

Q:  Be more specific on that.  What exactly did he do
to himself?

A:  That -- he was touching his penis and that he had
an erection.  So I told him that it was late or that I
had to go home, and so I went to turn the corner and
about a couple of -- you know, a couple of seconds of
walking down on to Hyatt Street I had this really
awkward feeling that somebody was watching me....

(TR at 76-77).

DL testified that he became nervous and wanted to end

the approximately 5 to 6 minute conversation, so he said he had

to get home.  (TR at 119).  As he turned to leave, he saw that

his neighbors, the Boyces, were pulling into their driveway.  DL

did not know if anyone was home at his house, and he did not want

the Respondent to see where he lived, so he walked to the Boyce

house and told Mr. Boyce and his friend about a conversation with

a man in a white car that made him feel uncomfortable.  The

investigation of Officer Abbott and Sgt. Carpenter confirmed that

---

    8   On cross-examination, DL testified that he asked the
Respondent if he was staying in a hotel in the area, and he asked
this to create small talk.  (TR at 126-28).

DL came to the Boyces immediately after his conversation with the
Respondent, and that DL reported feeling uncomfortable about that
conversation and afraid to go straight home for fear that the
Respondent then would know where he lived.    (TR at 77-78; E-17,
26, 27, 28).

          Mr. Boyce said DL should go tell his parents about the
encounter, which DL did.   Thereafter, Mrs. L called the police,
and Patrol Officer Abbott came to their home.   DL testified that
he told his mother that someone in a white car asked him for
directions and asked him to come back to the driver's hotel room.
DL candidly testified that in his initial conversations with his
parents, he left out the part about the man's masturbatory
conduct, because he was "a little embarrassed," though he told
this to Officer Abbott when they were alone on DL's driveway.
(TR at 85-87).

          DL stated that later in the evening of April 24, 2004,
he was alone with his father and he then told his father about
the Respondent "playing with himself."   (TR at 92-93).   DL
testified that he was hesitant to tell his parents the entire
story because "It was very awkward.  Somehow I felt that it was
my fault that I talked to him for so long, not that they'd be mad
at me, but that I just...I didn't -- I didn't know what to do in
that situation."   (TR at 92; accord TR at 184-85).

          DL explained that a few weeks after the event, a man
and a woman from Rockland County came to speak with him in front
of his parents.   (The investigators were Det. Cooney and Det.

11

Moody-Dennison.)  As DL told those two investigators what had
happened, that became the first time his mother heard about the
Respondent's masturbatory conduct and the first time both parents
heard that the Respondent asked DL back to his hotel after
knowing DL's age.  (TR at 99-100).

In the course of his testimony, DL stated that he was
"very much scared; I was nervous" and that he did not tell his
story that night exactly in the order in which it happened.  (TR
at 86, 90).  The Hearing Officer notes that this admission by DL
was not in answer to a specific question about chronology, nor
was it on cross-examination.  Rather, it was a very believable
explanation why Abbott might have heard a more jumbled account
than Cooney, Moody-Dennison or Carpenter heard from DL.

On April 24, 2004, P.O. Abbott spoke to DL in front of
his parents in DL's home.  (2TR at 151-52).  The report issued by
P.O. Abbott did not contain certain critical details to which DL
testified at the hearing.  For example, according to Abbott, DL
did not tell him that the Respondent asked him his age and then
asked him if he wanted to come to his hotel.  From this alleged
failure of DL to tell these obviously critical details to PO
Abbott, the Respondent argues that DL's testimony is incredible.
The Hearing Officer does not agree.

The Hearing Officer is persuaded that DL told parts of
the story to Abbott in the presence of Mr. and Mrs. L, and then
DL told Abbott the other parts of the story that he found
embarrassing only when they were out of DL's parents' presence.

12

Yet, P.O. Abbott testified that what he wrote in his report was
the information told to him by DL in front of the parents.[9]  (E-
21; 2TR at 179-80).  That report contains the allegation that the
Respondent "was rubbing and grabbing his genital area."  The
Hearing Officer finds that P.O. Abbott is not accurate that this
information was given to him by DL in the presence of his
parents.  First, DL testified that he told this to Abbott when
they went to Abbott's car after the conversation in the presence
of his parents.  (TR at 85-87).  Second, DL's mother recalled
Abbott and DL walking out to the car after the conversation in
the house.  (3TR at 7-9).  Third, Det. Sgt. Cooney and Det.
Moody-Dennison testified that when they spoke to DL in the
presence of his parents, the parents seemed truly surprised at
hearing that the Respondent asked DL his age and then invited him
back to the hotel.  (2TR at 91, 93, 118).  Finally, DL also
stated that the conversation with Cooney and Moody-Dennison was
the first time his mother learned about the Respondent rubbing
his penis and achieving an erection in DL's presence.

Similarly, the Hearing Officer credits DL's testimony
that he told Abbott the Respondent had an erection after rubbing
himself in DL's presence, yet there is no reference to an
erection in Abbott's report.  (E-21; TR at 147).  Abbott
testified that DL told him he could not tell whether the

_____

[9]  P.O. Abbott testified that he spoke to DL on the driveway
for about one minute, just to get DL's name, date of birth, address
and telephone number, and then the rest of the conversation was in
DL's home in the presence of his parents.  (2TR at 175-77).

Respondent had an erection, and Abbott chose not to include this
in his report. (2TR at 188). The Hearing Officer finds that the
alleged inconsistencies pointed out by Respondent's Counsel are
not the result of incredulities by DL, but are the result of a
lack of detail and certain inaccuracies in Officer Abbott's
report. Sgt. Carpenter testified that he spent approximately two
hours with DL getting his statement, and that part of Carpenter's
expertise is how to interview a child. He explained that P.O.
Abbott does not have that same training or expertise, and that
the patrol officer's job is not to take the most detailed
statement -- that could be done by a detective. (2TR at 217,
220-21, 268-69).

The Hearing Officer's conclusion that P.O. Abbott's
report was less than comprehensive is strengthened when the
testimony of other investigators is examined. For example, Det.
Sgt. Patrick Cooney testified that on May 18th, he and his
partner, Det. Shari Moody-Dennison, went to Cortland to interview
P.O. Abbott and DL. According to Det. Cooney, DL told them in
the presence of his parents, that the Respondent asked DL where
the action was and when DL did not understand, the Respondent
asked "where's the nearest gay bar?" When DL said he did not
know, they had a conversation about DL's appearance and whether
DL was a student at SUNY Cortland. DL told the Respondent that
he was in 8th grade and was 14 years old. They discussed that
the Respondent was in town from New York for a few days and was
staying at the Holiday Inn. According to Det. Cooney, DL told

14

him that the Respondent asked DL if he would like to come back to
the Holiday Inn with him, and that DL said the Respondent was
rubbing himself in his genital area. (2TR at 10-11). Det.
Cooney and Det. Moody-Dennison each testified that they asked DL
to repeat the story and it was repeated three times with
accuracy, which caused Cooney and Moody-Dennison to believe DL.
(2TR at 11-12, 91). Cooney and Moody-Dennison believed DL was
credible even though they were learning things that were not
contained in P.O. Abbott's report. (2TR at 13). It is also
noteworthy that Det. Cooney knew the Respondent for 15 years and
clearly had no animus toward him. (2TR at 6). In fact, Det.
Cooney first told DL's parents that he was in Cortland to verify
that there was some misunderstanding regarding the Respondent
(2TR at 16), and he did not try to be relieved of this
assignment, because he hoped to protect Mr. Gould's reputation.
(2TR at 36).

Det. Moody-Dennison testified that when she interviewed
DL in May 2004, he looked to be about 14 years old; he did not
look like he was in college. (2TR at 90). The Hearing Officer
finds that even accepting Det. Moody-Dennison's impression of
DL's age, the key in this case is that the Respondent engaged in
lewd behavior by rubbing his genitals to the point of producing
an erection and inviting DL back to this hotel <u>after</u> DL told
Gould that he was 14 years old.

The Hearing Officer therefore finds that the
inconsistencies alleged by the Respondent as to DL's story are

not substantial inconsistencies and can be explained either by the level of detail of the questioner or by the fact that DL was "shaky" immediately after the event and, by DL's own testimony, he may not have recited the events in the exact order in which they happened.

On April 28, 2004, the County hand-delivered a letter to the Respondent from the Deputy Director of Probation stating, in pertinent part:

> You are hereby directed to provide to me in writing on or before May 3, 2004, a complete written account of your conduct on April 24, 2004 in Cortland, New York, You should discuss in detail each and every aspect of your conduct with the complainant and your interaction with the Cortland Police Department.  In addition, please describe in detail the circumstances under which you disclosed your identity as a Probation Officer to the Cortland Police.  Please also indicate whether or not you have been previously detained/questioned, arrested and/or convicted of this similar conduct in the past.
> **PLEASE TAKE NOTICE** that failure to comply with this request on or before May 3, 2004, will be considered an act of insubordination and will result in formal disciplinary charges being filed against you.

(E-1).  The time to respond was extended by the Company.  (E-2). Thereafter, the Respondent filed a three and one-half page, single spaced response.  (E-3).  In his Reply Brief (at p. 1), Respondent's Counsel argued that no negative inference should be drawn from the Respondent's failure to testify at the hearing and that the County already had the Respondent's version of the events in Mr. Gould's May 6, 2004 letter (E-3).  The Hearing Officer therefore quotes the salient parts of Mr. Gould's letter, accepting it as the Respondent's version of the facts in issue.

...You have directed that I respond to certain specific
questions posed by you, apparently as a result of your
conversations, or other contact, with Cortland Police
Lt. Gesin.  You have further advised that my failure to
respond in the manner requested will be considered an
act of insubordination resulting in the filing of
formal disciplinary charges.  Under the compulsion of
your letter, I will do precisely what you have
directed.  I will detail for you the entire incident,
including what I did, and what I said, to all persons
involved....

   Before I address the incident, however, let me
answer your questions regarding my "past", and whether
I have previously been detained, questioned, arrested
and/or convicted "of this or similar conduct".  Quite
frankly, after 28 years of unblemished service in and
to the County, 20 with this Department, I am more than
a little troubled by the tone of the questions posed,
and the direction your investigation appears to be
taking....
   The answers to those questions regarding my past are
"no", "no", "no", and "no".
      ***
   What occurred in Cortland on April 24th is the
following:
   On the date in question, I was in Cortland with my
15 year old daughter, who was playing in a basketball
tournament.  After she had finished her games that day,
we checked into the Hampton Inn.  While my daughter was
getting ready for dinner, I went to the Deli a few
blocks from the motel.  I pulled into the Deli and when
I got out of my car two males, who appeared to be in
their 30's, in a black 4-door car, started calling to
me.  They were laughing and making remarks at me, such
as "Isn't he cute".  I replied simply that they should
just get lost, and immediately went into the store.
When I came out of the store and started toward my car,
their car was leaving the parking lot. The passenger
was again laughing and making comments, and said
something about coming to the bar with them. The
passenger was hanging out of the window.

   My immediate reaction -- admittedly not smart -- was
to follow them, and let them know that I did not
appreciate their comments.  I got into my car and drove
off in the same direction, but lost sight of their car.
The first person I came upon, walking down the street,
was the individual referenced in your letter.  I
immediately pulled to the side of the road to ask for
directions.  I did not follow him.  He was on a cell
phone at the time, but he quickly hung up.  <u>I then</u>

<u>asked him "Do you know where the gay bar is?"</u>
specifically because of the nature of the comments that
had been made toward me. He responded no, that it was
probably in Ithaca.  I told him that I thought it was
in this direction (because that was the direction the
other car had taken).

The individual then asked me where I was from, and I
replied New York.  He said "New York City?"  Not really
wanting to say too much, I simply said "yeah."  He
asked me where I was staying and I told him the Holiday
Inn, not the Hampton Inn where I was actually staying.
<u>I asked if he was a student at SUNY Cortland to which
he replied "No, I'm 14 and in the 8th grade."</u>  That was
when and how I learned of his age, because his
appearance was that of someone considerably older.
Hearing that, I felt uncomfortable and immediately
left.

At no time did I rub or grab my genital area while I
was speaking to the individual, and I never admitted to
doing so.

Later that night, while I was in the lobby of the
motel, I overheard a police officer asking people if
anyone owned a white car.  I replied that I did, and he
asked if he could speak to me outside for a moment....

The officer asked to see my identification, in
response to which I  walked to my car to get my wallet.
<u>When I opened my wallet to show him my license, my
badge was visible inside,</u> at which point he asked if I
was "on the job."  I replied no, that I am a probation
officer/peace officer in Rockland County.  That is how
my badge and occupation first were disclosed.
***

That is what happened.  I did not "follow" the young
man as is alleged in your letter.  (Nor is it even
alleged in the police report that I followed the
individual because I have seen the report.)  Nor did I
"touch" or "grab" myself while I was in his presence.
And I did nothing intentionally to make him feel
uncomfortable.  Was it poor judgment on my part to try
and follow and then find, the individuals who had
taunted me?  Yes. Would I do it again, No.  But there
was nothing more to my contact with the young man or
with the police than that which I have explained.
***

(E-3, emphasis added).

In the Respondent's written version of the events quoted above (E-3), he admits to asking DL "Do you know where the gay bar is?" This admission is in direct conflict with his comments in court during his sentencing and allocution to the violation of Section 240.26(3):

> THE COURT: Okay, and did you further ask him [DL] where a gay bar was?
>
> MR. GOULD: No, I did not, Your Honor.
>
> THE COURT: Well, that is in your statement. Maybe you want to review that statement?
>
> [RESPONDENT'S COUNSEL:] Your Honor, the statements indicate that he was asked that.
>
> THE COURT: So you are not saying that you asked that, but that was the statement of the officer?
>
> MR. GOULD: That's correct.

(E-19). The Hearing Officer finds that the Respondent's lack of honesty is amply demonstrated by this clear conflict between his prior written admission and his statement in open court. This lack of honesty weighs heavily in the Hearing Officer's finding that the Respondent's version of the events is not credible.

A substantial part of the Respondent's Brief is devoted to recounting the testimony of all witnesses and highlighting how the story each records in purporting to recount what DL told them is different in part from one another. The main comparator seems to be the report of P.O. Abbott, the first officer to speak to DL. The Hearing Officer finds that Mr. Abbott thought he was being told of another instance in the upstate area of an attempted child abduction. (E-25). The Hearing Officer finds

19

that P.O. Abbott was not precise in his recordation of everything
DL told him, though, to be sure, DL did leave out some important
details when Abbott interviewed the teen in front of his parents.
The Hearing Officer finds that certain details of DL's story
either appeared in a report or did not based on the questions and
follow-up questions asked by the interviewer. For example, at
the hearing, Counsel for the Respondent asked probing questions
of DL regarding his sexual orientation. As a result of those
questions, DL candidly testified that he had been questioning his
sexuality. Those remarks were not made to the Cortland or
Rockland County investigators, because those questions were not
asked of DL. (TR at 179; 2TR at 235-36). His failure to
describe those issues to the various investigators is not an
indication of DL's incredibility. Rather, it is a testament to
the very thorough questioning by Respondent's Counsel and DL's
very candid responses.

      As a further example of alleged inconsistencies by DL,
Respondent asserts that on cross-examination, DL said that Gould
asked DL to go back to his hotel room. Respondent contends that
in DL's prior written statement, he never alleged that the
Respondent invited him to the hotel room -- just to the hotel.
(Brief at p. 9). The Respondent contends that this is a material
inconsistency in DL's testimony. The Hearing Officer does not
agree. DL understood that he was being invited to the
Respondent's hotel, and that made him uncomfortable and he tried
to change the conversation. The Hearing Officer can think of no

20

interpretation attached to inviting a minor <u>alone</u> to the
Respondent's hotel that does not constitute serious misconduct.
If the invitation was for a sexual purpose, the misconduct is
clear. If the invitation was for DL to meet his teenage daughter
and have dinner with them (which no one contends!), the
misconduct also is apparent, because this child was on his way
home, and there is no reason whatsoever for the child to be
accompanying a stranger to a hotel. Accordingly, the Hearing
Officer does not find it to be an indication of lack of
credibility if DL at one time said the Respondent invited him
back to his hotel, and at another time recalled that he was
invited to the Respondent's hotel <u>room</u>. Either invitation is
inappropriate as DL was a minor, and the variation in this aspect
of his testimony does not diminish DL's credibility.

    The Hearing Officer also notes that at a time
relatively close to the events in question, Det. Sgt. Patrick
Cooney from Rockland County reported to the Probation Department
that he and Det. Moody-Dennison interviewed DL. He wrote:

> The victim explained step by step what had taken place
> 04-24-04 involving himself and a white male, later
> identified as James Gould. The victim repeated the
> entire incident, several times and was questioned about
> aspects of the incident. <u>He never wavered, he never
> changed any facts or the order in which they had taken
> place.</u> The victim was calm and collected. He appeared
> to understand what he was saying and the questions that
> were being asked of him. The victim came across as
> very creditable (sic) and mature. (emphasis added) ¡

(E-22; 2TR at 11-12). The Hearing Officer credits Det. Cooney's
testimony that he did not take notes in DL's presence. Instead,

he wrote his report from memory.  The Hearing Officer therefore finds that minor variations (e.g., whether the first question from the Respondent was "where is the action" or "where are joints") can be explained by Cooney's lack of contemporaneous notes.  (2TR at 45-46).

Upon thorough consideration of the evidence in the record, the Hearing Officer makes the following findings.  The Hearing Officer finds that the Respondent drove his car up to DL who was walking home.  The Respondent asked DL where the action was, and when DL did not understand, the Respondent asked him "Where are the gay bars?" or words to that effect.  When DL did not know, the Respondent asked DL if he was a freshman at SUNY Cortland.  The Hearing Officer finds that DL told the Respondent he was not in college, he was in eighth grade and was 14 years old.  The Hearing Officer specifically finds that the Respondent continued the conversation after hearing that DL was 14 years old and eventually asked DL if he wanted to come to the Respondent's hotel, which the Respondent said was the Holiday Inn.

Thus, the Hearing Officer finds that the Respondent invited a minor to his hotel.  The Hearing Officer rejects the Respondent's argument that DL is incredible because he told some parties that the Respondent invited him back to the hotel, and he told others that the Respondent invited him back to the hotel room.  (TR at 136-37).  Any suggestion by the Respondent that there is something equivocal about inviting a minor back to his hotel, as opposed to his hotel room, is expressly rejected.

The Hearing Officer further credits DL's very carefully worded testimony that when the Respondent was seated in his car and talking to DL, the Respondent began to rub his (Respondent's) genitals on the outside of his pants, and that his pants were not unzipped. (TR at 88, 90). DL did not attempt to leave an impression that the Respondent had exposed himself. By being forthcoming with precise details, DL's credibility was enhanced.

With respect to the Respondent's masturbatory conduct, this was the act which caused DL to become uncomfortable and to terminate the conversation. (TR at 90). The Hearing Officer finds the Respondent's conduct to be lewd and completely inappropriate under the circumstances. When viewed in the context of the rest of the conversation (i.e., where is the action; where are the gay bars; do you want to come to my hotel), this conduct was both lewd and intimidating and wholly inappropriate to have with a 14 year old boy.

The Hearing Officer finds DL's testimony to be credible. First, DL testified carefully and with great detail about how the car approached him, where the car was stopped and how the conversation proceeded. DL had the nervousness in testifying that one would expect to see from a teenager testifying about a matter he said was embarrassing. Yet, DL had the clarity not to overstate the Respondent's actions or to testify too broadly. In fact, DL testified that at the point when the Respondent asked him where the gar bas was, DL was not frightened of the Respondent; he thought the Respondent was just

someone looking for directions and "he seemed like a nice guy."
(TR at 123-24). DL answered all questions on cross-examination
clearly and precisely, even when the subtext to the line of
questioning was to cast doubt why any reasonable 14 year old
would continue an uncomfortable conversation with a stranger.
The Hearing Officer finds DL's response to that query to be very
compelling. DL candidly explained that he was going through some
difficult things at home and maybe, for a fleeting moment, he
wondered if this man would take him to New York City and,
presumably, away from whatever issues then troubled him in
Cortland. (TR at 88-90). The Hearing Officer finds DL's
vulnerability to be weighty, so his testimony on this point is
quoted in full.

> Q [from County Counsel]: How did it make you feel when
> he asked you to come back to the hotel with him?
>
> A [DL]: Very uncomfortable. I was going through a lot
> in my life and with my parents. The odd thing was
> about the whole situation just with different stuff
> with me and my life, I...
>    This thing came in mind, well, I could go back to
> New York City, and there was no mention of this on his
> half, but this was all in my mind that, you know, I
> could even run away. I could go back to the city and
> whatnot and maybe live with him or something.
>    I didn't know where he lived, but he said he lived
> near the city. And the thing that was the scariest to
> me was, you'd think putting -- that being put in that
> situation your first response would be, no, and it
> wasn't and I think that's what was so scary about the
> whole situation is I had to, you know, basically smack
> myself into common sense and, you know, then I was
> like, I need to end this conversation. I didn't-- I
> didn't want to be rude to him. I guess I didn't
> understand the whole-- the whole-- the whole incident
> at the time until later on that night. But I think
> that's why I tried to change the subject but not
> completely walk away from the situation.

24

Q:  Why did you talk to him for so long?

A:  My father is in the ministry and, so, talking to
strangers or, you know, people that I don't know has
just been common to me, you know. So the fact the
conversation was just being me being nice to someone,
the fact that he was from The City made me want to talk
to him more because I've been in The City, New York
City, a number of times, and the similarity there, and
the conversation was only a few seconds after he
started playing with him -- playing with himself, was
the point where I was like, okay, I've had enough of
this; I don't feel comfortable.

Q:  How did that make you feel?

A:  Very, very uncomfortable, very nervous. And I think
the lightbulb had turned of, maybe I'm in danger and so
- which scared me more. When I was walking away, it
was really -- I don't know if you've ever seen the show
Without a Trace. But in the beginning sequence, they
show a brief little scene, then the person disappears
and I really remember I had this, like, very strong --
I remember walking down the street and feeling that and
having that come to my mind, seeing him still in the
street. I almost, like, saw myself out of my body but
on the street and I saw myself disappear which was
extremely scary for me. Still.

(TR at 88-90). When asked whether he still thinks about this

incident as of the date of the hearing (i.e., almost two years

later), DL stated:

Every once in a while. Like...
Comes to my mind, you know, of what could have happened
that day. You know, sometimes I try and rethink the
whole incident and see what I could have said or what I
-- if somehow the fact that I had asked him where his
hotel was if that's why he asked me to go back to it.
You know, if it seemed like I was, you know...
    I was trying to make conversation, but if he would
have looked to that as me trying to -- as a come-on--,
you know, if was really -- <u>if it was my fault of
whether or not he had asked me to come back to his
hotel room with him.</u>

(TR at 111; emphasis added).

The Hearing Officer finds DL's testimony to be compelling proof that the Respondent's actions caused the child discomfort within the meaning of Penal Law Section 240.26(3),[10] and that he caused DL psychological harm. DL's father testified that in the year after the contact with the Respondent, DL was troubled with himself for any thoughts that he might have wanted to go with the Respondent. (3TR at 101). DL's mother similarly testified to DL being troubled and withdrawn after this event. (3TR at 28-30). The Hearing Officer finds that the Respondent's actions did not <u>potentially</u> endanger a child; the Respondent <u>actually</u> endangered DL.

The Hearing Officer finds that the key to the disposition of these charges is that the Respondent, as the adult, and not just any person of majority age, but an adult who works with troubled youth, must know that he had an obligation not to have a conversation with a 14 year old stranger in which he gained the child's trust by making the child feel comfortable with him, and then ask the child to come back to his hotel. Further, the more open and friendly DL became, the Respondent should have seen DL as a vulnerable teen. In this case, at the point when the Respondent learned that DL was 14 years old, the Respondent had an absolute obligation to end the conversation. The Respondent did not have a chance meeting with DL in some innocuous setting. The Respondent drove up to a child walking alone to ask "where's the action?" and "where are the gay bars?".

---

[10] <u>See</u> discussion on Charge III, <u>infra.</u>

The Respondent did not drive into a gas station to ask some random adult employee where the gay bar is in town.  The Respondent stopped a tall, thin, young man walking alone in a neighborhood to ask where the gay bar was located and, ultimately, to invite the teen back to the Respondent's hotel. The Respondent's act of rubbing his genitals during the conversation with the teen proved that the conversation was not innocuous.

The next question is whether the Respondent can be disciplined for this off-duty/off-premises misconduct.  For the reasons set forth below, the Hearing Officer finds that the Respondent can be disciplined.  The test for whether an employer can discipline an employee for off-duty/off-premises misconduct is whether there is a nexus -- a connection -- between the off-duty misconduct and the employee's employment.  In this case, the Respondent is a Senior Probation Officer with responsibilities for individuals designated as PINS, i.e., Persons in Need of Supervision.  The PINS are below the age of 18.[11]  Thus, the Respondent's job is to help troubled youth and, if possible, to keep them out of the penal system.  As part of that job, the Respondent must be sensitive to the problems teenagers can have and to their vulnerabilities which get them into trouble with law enforcement.

It is not a stretch to suggest that a 14 year old

---

[11]  At the time of the incident, the PINS law may have been 16 years of age.

27

runaway could be one of his PINS clients, and a vulnerable minor
who turns to prostitution also could be one of his PINS clients.
It is inconceivable to the Hearing Officer that one could work
with troubled youth and fail to appreciate the vulnerabilities of
teenagers. In this case, the Respondent took advantage of a
naive, vulnerable child by engaging in a conversation designed to
cause the child extreme discomfort. There is a direct connection
between taking advantage of a vulnerable child and the
Respondent's job to punish those who do exactly that. If the
Respondent did not understand how his conversation and
masturbatory gestures would make this 14 year old uncomfortable,
then he lacks the skill and objectivity to be left alone with
minors in the course of his job. Based on the Respondent's plea
to the violation of harassment, he understood that his
conversation made DL feel uncomfortable and that it was designed
to do so. The Hearing Officer finds the required nexus between
the Respondent's off-duty/off-premises misconduct and his
employment.

Any suggestion by the Respondent that DL was
questioning his sexuality and therefore fantasized or imagined or
embellished this encounter is expressly rejected. If DL was
questioning his sexuality, that may have contributed to his
willingness to have any conversation with this stranger. The
Hearing Officer finds no indication whatsoever that the incident
was the product of DL's imagination or fantasy.

28

Turning now to the Charges and Specifications (E-5)[12]. Charge I states, in pertinent part:

CHARGE I:  GROSS MISCONDUCT:  INTENTIONALLY ENDANGERING THE WELFARE OF A CHILD
SPECIFICATION:
You have been employed with the Department of Probation since July 23, 1984.  From April 7, 2003 to the present you have been employed as Senior Probation Officer.  Your job duties include intake of all PINS (Persons In Need of Supervision) youth, referral of PINS youth to DAS (Designated Assessment Services) team, coordination of DAS teams, supervision of all diverted PINS youth (in the office interviews, home visits, and school visits) and General Juvenile Unit duties including transporting PINS and JD (Juvenile Delinquent) youth, court coverage, and information and referral to families.  In sum, you are personally responsible for the Department's juvenile delinquents and PINS youth cases.

On or about April 24, 2004, while off duty in the City of Cortland, New York, you drove your passenger vehicle up to a 14-year-old male pedestrian.  You had placed a six-pack of beer on the passenger seat of the car next to you.  Said beer was visible to the 14 year old.  You asked the child where any "joints" were?  The child replied that he did not know.  You asked the child were the "action" was.  The child replied that he didn't know what you meant.  You then asked the child where "the gay bars" were.  The child replied that he didn't know of any gay bars in Cortland.  You then asked the child if there were any "gay bars" in the surrounding towns you could go to.  The child told you that there might be some in the Ithaca area.  You then asked the child what year of college was in.  The child told you that he was not in college, that he was in the 8th grade and that he was 14 years old.  You replied that he looked tall for a 14 year old, asked him if people say he looks older than he is, asked him if he went to high school in town, and asked him if he lived in the area.  The child told you that he lives in the area.  You then discussed life in Cortland and New York City with the child before you told him you were staying at the Holiday Inn and asked the child to go back to the hotel with you.  Your hotel room offer

_____

[12]  As quoted herein, the Charges and Specifications are the Amended Charges dated January 11, 2006, as accepted by the Hearing Officer's ruling _supra_.

29

shocked the child. As the child attempted to change the topic of your conversation, you took your left hand and stared to rub your penis on the outside of your pants causing an erection through your pants. Your masturbatory actions greatly upset the child. The child abruptly ended your (sic) conversation and walked away from you up the street. Notwithstanding the child's departure, you proceeded to the middle of the intersection following and watching the child. Your conduct in attempting to follow the child or at least see where he was going caused the child to panic and seek assistance from a neighbor across the street. When you observed the child seek assistance you immediately left the scene in your vehicle.

As a result of your actions with the child, the Cortland Police were called to investigate. They located and questioned you at your hotel. You identified yourself to the police as a Rockland County Probation Officer, but admitted you were not on the job. You admitted to the police that you asked the child "where a bar was" but refused to comment (i.e. failed to deny) that you asked the child were a gay bar was. You were subsequently criminally charged, by the Cortland Police, based upon your actions with the child. [The Amendment which was rejected was stated here.]

Your misconduct with the child consisted of intentional actions knowingly performed in a manner likely to be injurious to the physical, mental and/or moral health of the 14-year-old child...As a Probation Officer with over twenty (20) years experience, your actions demonstrated extremely poor judgment and the deliberate intent to harm a child of a class it is your duty on the job to help and protect.

The Hearing Officer finds that the facts as found

herein by the Hearing Officer support a finding of guilt for

Charge I.[13] The Hearing Officer specifically finds that the

_____

[13] In so finding, the Hearing Officer need not parse every sentence of the Specification. For example, DL did not testify that the Respondent asked him where the "joints" were, though he did testify to the Respondent asking where the "action" was and where the gay bars were. In finding the Respondent guilty of Charges I and II, the Hearing Officer relies on the facts as found in this Report and Recommendations.

Respondent's intentional actions were knowingly performed in a manner likely to be injurious to the physical, mental and moral health of the 14 year old child with whom the Respondent spoke. Further, the act of rubbing his genitals and achieving an erection which the child could see, though the Respondent's pants were on and were zipped closed, had the foreseeable effect of causing the child emotional harm. For all of these reasons, the Hearing Officer finds that James Gould engaged in the misconduct alleged in Charge I.

Charge II states (E-5):

**CHARGE II: GROSS MISCONDUCT: RECKLESSLY ENDANGERING THE WELFARE OF A CHILD**

SPECIFICATION:
Even if unintentional, based upon your over twenty (20) years experience as a Probation Officer (one year in charge of youth cases) you should have realized your actions as set forth in the Specification to Charge I would be injurious to the physical, mental and/or moral health of the 14 year of child. Your admitted conduct (stopping the child, asking where the bars were, then asking [where] the gay bars were) in and of itself demonstrates such a high degree of poor judgment and reckless disregard for the welfare of a child so as to mandate your dismissal.

The Hearing Officer does not agree with the premise of Charge II that Mr. Gould's actions could have been unintentional. The Hearing Officer is persuaded that Mr. Gould may have begun the conversation thinking that DL was a college age student, but once DL told the Respondent that he was in 8th grade and was 14 years old, then the Respondent knew he was talking to a minor.

31

Nevertheless, the Hearing Officer sustains Charge II because once
Mr. Gould knew that DL was 14 years old, Gould's actions were, at
a minimum, reckless. Therefore, James Gould is guilty of the
misconduct alleged in Charge II.

        With respect to Charges I and II, the Respondent
argues, in his Reply Brief,

        Since a finding of guilt in this case would
        significantly impair Plaintiff's employment in his
        chosen field and significantly stigmatize him, the
        logic of Miller v. DeBuono, 90 NY 2d 783 (1977) applies
        and, a preponderance evidence standard control in this
        matter. (sic)

The Respondent then argues that the County cannot meet its burden
by even a "substantial evidence" standard.

        The Hearing Officer finds that the record in this
matter proves Charges I and II by more than a preponderance of
the evidence. In making this finding, the Hearing Officer has
evaluated and weighed the demeanor of the witnesses who
testified, and has carefully studied the consistency of the
witnesses' testimony on their direct and cross-examination. The
Hearing Officer has weighed the witnesses' testimony against
their prior written and oral statements. Through this process,
the Hearing Officer made the credibility findings noted herein.
The Hearing Officer finds DL's testimony at the hearing to be
highly credible, even after a lengthy, detailed and exhaustive
cross-examination. The Hearing Officer finds the Respondent
guilty of Charges I and II by the more rigorous standard of

preponderance of the evidence.

Charge III states:

**CHARGE III: GROSS MISCONDUCT; SECOND DEGREE HARASSMENT OF A 14-YEAR OLD BOY IN VIOLATION OF SECTION 240.26(3) OF THE NEW YORK STATE PENAL LAW**

SPECIFICATION:
On June 28, 2005, in a criminal part of the Court of the City of Cortland, New York, you pled guilty to one charge of Second Degree Harassment in violation of Section 240.26(3) of the Penal Law of the State of New York. You were sentenced to a one-year conditional discharge, 50 hours of community service, a one-year permanent order of protection and a surcharge in the amount of $95.00. A copy of a Certification of Disposition provided by the Court is attached hereto and made a part hereof.

Section 240.26(3) of the Penal Law states:
A person is guilty of harassment in the second degree when, with intent to harass, annoy or alarm another person:...(3) He or she engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose.

In the course of your allocution by City Court Judge Thomas A. Meldrum on said charge of Second Degree Harassment, you admitted on April 24, 2004, in the City of Courtland (sic) you approached a 14-year old boy and engaged in a course of conduct which alarmed or severely annoyed said boy and which served no legitimate purpose. Also in the course of your allocution, Judge Meldrum directed that your community service was to be performed "...at a location that does not involve children."
.***

Your misconduct with the child consisted of intentional and deliberate actions designed to alarm or annoy the child and which served no legitimate purpose. Although committed off duty, your misconduct has a clear nexus to your departmental duties and responsibilities. As a Probation Officer with over twenty (20) years of experience, your actions demonstrated poor judgment and the deliberate intent to harm a child of a class it is your duty to help and protect. Such disregard for the welfare of a child mandates your dismissal in and of itself.

The record is clear that the Respondent pled guilty to a "violation", not the "crime" with which he was originally charged. His allocution in open court is meaningful, so the Hearing Officer quotes the salient parts of the record (E-19)[14]. First, the Respondent acknowledged that by entering a plea, he was knowingly waiving his right to a trial.

> THE COURT: Okay. And you would be pleading Guilty to a violation, not a crime; Penal Law 240.26, Subdivision 3, Harassment in the Second Degree, which carries a maximum punishment of fifteen days in jail, a fine up to $250, court charges in the amount of $95.00. Do you understand that?
>
> MR. GOULD: Yes.
>
> THE COURT: Which states that a person is guilty of Harassment in the Second Degree, when with intent to harass, annoy or alarm another person, when he or she engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serves no legitimate purpose, so the essential elements are that it would be an intent to annoy, harass or alarm that you engaged in a course of conduct or acts repeatedly that would annoy such person and serve no legitimate purpose.
> Do you understand all of that?
>
> MR. GOULD: Yes, I do Your Honor.
>
> ***
> THE COURT: Now, understanding all of that, the Court is now granting the motion to plead to Penal Law 240.26, subdivision 3, Harassment in the Second Degree, a violation.
> Mr. Gould, how do you plead to that charge?
>
> MR. GOULD: Guilty, Your Honor.
>
> ***
> THE COURT: ...Do you [ack]knowledge that on date that

---

[14] Employer exhibit 19 is the record of the Plea/Sentencing in Docket 04/38911: The People of the State of New York v. James H. Gould.

you did approach a fourteen-year-old, so-stated kid in this statement. Is that correct?

MR. GOULD: Yes, I did, Your Honor.

THE COURT: And he did not approach you, but you approached him?

MR. GOULD: That is correct.

THE COURT: And did you ask him where a bar was?

MR. GOULD: I did, Your Honor.

THE COURT: Okay, and did you further ask him where a gay bar was?

MR. GOULD: No, I did not, Your Honor.
***
THE COURT: So, you are not saying that you asked that, but that was the statement of the Officer?

MR. GOULD: That's correct.

(E-19, pp. 5-6, 10-12). Therefore, the Respondent acknowledged that he made remarks to DL, and because those remarks made the child feel uncomfortable, Mr. Gould was admitting that those remarks constituted a violation of Penal Law Section 240.26(3). The Hearing Officer is completely persuaded that as a Probation Officer with responsibilities for youth designated as Persons in Need of Supervision, the Respondent was obligated to have some understanding about the vulnerabilities of teens, and he likewise was obligated to know how to talk to teens without being so familiar as to be inappropriate. Here, the Respondent was blatantly inappropriate in his discussion with DL. The Hearing Officer finds that the Respondent knowingly engaged DL in a conversation which was more than asking directions, and then after learning that DL was only in eighth grade and, therefore a

minor, he invited DL back to his hotel and he engaged in the lewd behavior in the car of rubbing his genitals and producing an erection.

Once the Respondent learned that DL was a minor, his next action should have been to terminate the conversation and drive away. The Respondent's failure to do so and his subsequent conduct are the reasons the Hearing Officer sustained Charges I and II of endangering the welfare of a child. The Hearing Officer is completely persuaded that engaging in a conversation which had the purpose and effect of making a 14 year old stranger uncomfortable is totally anathema to the responsibilities of protecting children, which is a significant part of the Respondent's job. The Hearing Officer finds this to be gross misconduct.

In its Reply Brief (at p. 5), the Respondent argues that Charge III was never proven because the elements of the offense were never established by Gould's allocution. The Hearing Officer finds that the Respondent pled guilty to "Second Degree Harassment in Violation of Section 240.26(3)." Therefore, the conviction is dispositive of the elements of that violation. The undersigned Hearing Officer does not sit in judgment of a court that accepted an allocution that failed to contain all of the elements of the violation. Rather, this Hearing Officer takes the conviction as dispositive of the wrongdoing evidenced in the charge to which the Respondent pled and, as indicated supra, the Hearing Officer accepts the Respondent's admission in

his written response to the Charges that he did ask DL, "Do you

know where a gay bar is?". Accordingly, Charge III is sustained.

Charge IV states:

**CHARGE IV: GROSS MISCONDUCT: INJURY TO THE REPUTATION OF THE DEPARTMENT**
SPECIFICATION:
By committing the actions as set forth in the Specifications to Charge I, II and/or III and by identifying yourself as Rockland County Probation Officer, you have injured the reputation and potentially undermined public confidence in the Department of Probation. This injury is compounded by the fact that your duties for the Department include personal responsibility for youthful offenders, juvenile delinquent and PINS cases.

The Hearing Officer credits the testimony of Police

Officer Abbott that the Respondent was cooperative when Abbott

saw him at the Hampton Inn and asked the Respondent to step out

to talk for a minute. When it came time to identify himself, the

Respondent asked to get his wallet from the glove compartment of

his car. Upon opening his wallet, he made sure that Officer

Abbott saw his Rockland County Department of Probation badge.

The Respondent identified himself as being a probation officer

and quickly noted that he was not "on the job." (2TR at 156-58).

Mr. Gould did nothing to try to hide his badge from Officer

Abbott. (2TR at 164-65). The Hearing Officer finds that the

Respondent wanted Officer Abbott to see the badge in the hope

that some "professional courtesy" might be extended to him, and

to enhance his credibility in the eyes of Abbott. By making the

link to his professional responsibilities, the Respondent ensured

that the Cortland Police checked with the Rockland County
Probation Department to try to verify Gould's claim of
employment. This also set in motion the actions the Department
of Probation took to send investigators to Cortland to interview
witnesses to try to determine whether the Respondent had engaged
in misconduct or potentially criminal acts. (The Department's
witnesses were clear that they knew they had no jurisdiction over
any criminal acts committed in Cortland, even if a Rockland
County employee were implicated.)

        The Hearing Officer finds that throughout the
investigations by the Cortland Police and by the detectives from
Rockland County, the first focus was whether this adult male
(Respondent) acted criminally. Thereafter, the Respondent's
employment was intertwined in the investigation because the
Respondent had "flashed his badge" to P.O. Abbott on the night of
the incident. Any suggestion that his job was irrelevant was
negated by the Respondent's own actions. Once the Respondent was
criminally charged and he pled to the violation, his wrongdoing
became the wrongdoing of a Department of Probation employee. He
ensured that connection when he flashed his badge to a City of
Cortland Police Officer. Accordingly, the Hearing Officer finds
that the Respondent brought discredit to his job. For all of
these reasons, the Hearing Officer finds that Charge IV is
sustained.

        Finally, the parties asked the Hearing Officer to
decide whether the County had just cause to suspend the

Respondent for thirty days. I find that it did. As the facts were unfolding in this investigation in April 2004, the County came to learn that a long service employee was accused of endangering the welfare of a child in another City. The County knew that the Respondent's work duties put him in daily contact with children. The Hearing Officer finds that the County acted reasonably based on the information it had when it decided to suspend the Respondent pending an investigation. Accordingly, no remedy is due the Respondent for the period of the suspension.

In sum, upon thorough consideration of the evidence and argument in the record, the Hearing Officer finds that the Respondent engaged in the misconduct alleged in Charges I, II, III and IV; those Charges are sustained. The Hearing Officer is completely persuaded that the misconduct proven on this record is so severe as to warrant immediate termination of employment. Though the Respondent had many years of service to the County and no prior history of inappropriate contact with minors, the Hearing Officer finds that the misconduct in which Mr. Gould engaged in Cortland, New York was egregious, and it demonstrated that he is not fit to perform the duties of a Probation Officer. The nexus to the Respondent's work has been clearly demonstrated on this record so as to make this off-duty/off-premises misconduct discipline worthy.

The Hearing Officer finds that the misconduct proven was grounds for termination even if the Respondent had an unblemished record of service. However, he did not. On

39

April 12, 2005, Arbitrator Joel Douglas imposed a seven month suspension on Mr. Gould for insubordination in refusing an order to attend training and for making a fraudulent statement by representing that he was given permission not to attend one of the days of training. This misconduct occurred on April 14, 2004. (E-A; TR at 43-44). Thus, even if these Charges did not constitute an immediately terminable offense, and even if the Respondent's entire record were considered, termination would still be found to be the appropriate penalty.

## RECOMMENDATIONS

The Amended and Supplemented Charges and Specifications, dated January 11, 2006, are sustained to the extent the Amendment was accepted. The Respondent, James Gould, is guilty of the misconduct alleged in Charges I, II, III and IV in accordance with the Report herein. The Hearing Officer recommends that James Gould's employment with the County of Rockland be terminated effective the date of his disciplinary suspension without pay, i.e., November 19, 2004.

The Hearing Officer further finds that there was just cause to suspend James Gould for thirty days.

June 30, 2006

Bonnie Siber Weinstock
Hearing Officer

40

State of New York ) ss.:
County of Suffolk )

    On this 30th day of June, 2006, before me personally
came and appeared BONNIE SIBER WEINSTOCK, to me known and known
to me to be the individual described in and who executed the
foregoing instrument and she acknowledged to me that she executed
the same.

                                   Notary public

                                  GARY ALAN WEINSTOCK
                         NOTARY PUBLIC, STATE OF NEW YORK
                            No. 01WE6098609
                        QUALIFIED IN SUFFOLK COUNTY
                    MY COMMISSION EXPIRES 9/15/07